CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED
3/24/2025
LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal Action No. 7:22-cr-00046 |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| KEVIN C. BUTLER, | ) | |
| | ) | By:  Hon. Thomas T. Cullen |
| Defendant. | ) | United States District Judge |

In June 1982, a federal jury in Washington D.C. found John Hinckley Jr. not guilty by reason of insanity of 13 charges related to his attempted assassination of President Ronald Reagan and the grievous wounding of the president's press secretary and a local police officer. In response to widespread public outrage over this verdict, Congress, a little more than two years later, passed the Insanity Defense Reform Act ("IDRA").

The IDRA significantly narrowed the scope of the federal insanity defense. For over two decades prior to its passage, federal courts had utilized a two-prong test promulgated by the American Law Institute ("ALI"). The ALI test provided that a person is "not responsible for criminal conduct if, at the time of such conduct, as the result of a mental disease or defect, he lacks substantial capacity either to appreciate the criminality (wrongfulness) of his conduct *or* to conform his conduct to the requirements of law." Model Penal Code § 4.01(1) (1962) (emphasis added). Under the ALI standard, a federal criminal defendant had two ways to establish an insanity defense. First, he could show that, because of a mental illness, he didn't understand or appreciate that his actions were wrong. Second, a defendant could be deemed criminally insane if he was incapable, because of a mental illness, of controlling his behavior, despite understanding that it was illegal.

The IDRA jettisoned the second prong of the ALI standard so that, today, a federal criminal defendant may be acquitted by reason of insanity only if, "as a result of a severe mental disease of defect, [he] was unable to appreciate the nature and quality or wrongfulness of his acts."[1] Simply put, under current law, a person who understands what he is doing and appreciates its wrongfulness cannot otherwise establish legal insanity because mental illness made it difficult to control his actions.[2]

Defendant Kevin Butler raised an insanity defense after being charged with seven counts of knowingly and willfully making threats against the president of the United States and his successors to the presidency, in violation of 18 U.S.C. § 871. (*See* ECF Nos. 19, 70.) These charges stem from a series of phone calls and voicemails Butler directed to his state probation officer while he was a patient at Catawba Hospital ("Catawba"), an inpatient psychiatric facility near Roanoke, Virginia, in late-November and early December 2022.

---

[1] In effect, the IDRA codified a common-law version of the insanity defense known as the *M'Naghten* rule, which held that a criminal defendant would be deemed legally insane if "at the time of committing the act [he] was laboring under such a defect of reason of, from disease of mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong." *M'Naghten's* Case, 8 Eng. Rep. 718 (H.L. 1843). As many lawyers will recall from first-year criminal law, under *M'Naghten*, a mentally infirm defendant accused of killing his wife with an axe could be deemed legally insane if, for example, he believed that he was chopping down a tree or, if he didn't mistake his wife for a tree, that he genuinely believed God had instructed him to do so.

[2] The IDRA also modified Federal Rule of Evidence 704 so that expert witnesses—in this context, psychiatrists, psychologists, and mental-health providers—can no longer opine on the ultimate issue of a defendant's mental state at the time of the alleged crime. The practical effect of this rule change is that these experts, whose testimony is still critical and usually outcome determinative, may describe the mental-health conditions at issue and their attendant symptoms and answer hypothetical questions about how individuals suffering from these illnesses might respond to various factual scenarios. But under the IDRA-amended version of Rule 704(b), these experts can no longer opine about the defendant, specifically, and how his mental illness affected his state of mind at the time of the alleged crime.

Based on the evidence presented during a bench trial[3] in December 2024, it is undisputed that Defendant Butler, in fact, made these calls and, in so doing, threatened to kill then-President Joe Biden and then-Vice President Kamala Harris. He freely admitted as much to a U.S. Secret Service agent who interviewed him at the psychiatric facility days later, after his probation officer alerted federal authorities to the threats. During his interview with the Secret Service agent, Butler reiterated his threats against the president and provided additional details about how he intended to make good on those threats upon his release from the hospital. The agent prepared a report of his interview with Butler but did not arrest him that day. Apparently frustrated by this inaction, Butler left three more voicemails for his probation officer four days later in which he repeated his intention to kill the president and vice president and added, for good measure, that he would kill Secret Service agents and U.S. Marshals and shoot up a federal building. The government filed the instant charges against Butler the following day.

Given the uncontroverted nature of the evidence related to the threats, it was unsurprising that most of the trial was devoted to presenting expert testimony and psychiatric records about Defendant Butler's mental state prior to, and at, the time he made these threats. Both parties skillfully marshalled the available evidence to advance their markedly different views on the ultimate question of whether Butler suffered from a severe mental disease or

---

[3] After undergoing two rounds of mental competency evaluations at a Bureau of Prisons facility in Miami, which delayed the criminal proceedings for nearly two years, Butler was returned to this district to stand trial. He waived his right to a jury and opted for the court to serve as the finder of fact. (*See* ECF No. 99.)

defect that made him unable to appreciate the nature and quality or wrongfulness of his actions. This was no easy task, as Butler has a lengthy and convoluted mental-health history.

On one hand, the evidence demonstrates that Butler, who is now 45 years old, has struggled with mental illness and polysubstance abuse since he was a teenager. Over the past 25 years, he has cycled in and out of inpatient psychiatric facilities, hospitals, homeless shelters, local jails, and federal[4] and state prisons. His mental-health records over that period, although voluminous, are far from conclusive regarding the cause of his often erratic and irrational behavior. The mental-health conditions described in the records run the gamut from antisocial personality disorder to schizophrenia and schizoaffective disorder. But those same records are replete with references to malingering and manipulative behavior, as well as drug-induced paranoia.

But Butler's experiences over the four months immediately preceding the threats at issue demonstrate that his symptoms, whatever their cause, became more acute. Between July 2022 and his November 2022 commitment to Catawba, Butler was admitted, as a psychiatric patient, to six different inpatient facilities across Virginia on at least seven separate occasions. Three days before he was committed to Catawba, Butler, just hours after being released from a psychiatric hospital in Northern Virginia, called 911 from inside a grocery store and told the

---

[4] In 2012, Butler, who was then serving a state prison sentence for carnal knowledge of a minor, wrote letters from prison threatening then-President Barack Obama and then-Vice President Biden. He was subsequently charged with making threats against the president and vice president. Butler pleaded guilty to making these threats and was sentenced to 19 months in federal prison. The government noticed these prior threats under Fed. R. Evid. 404(b) to prove Butler's knowledge and state of mind when he made the threatening calls from Catawba to his probation officer. The court ruled that these prior threats unquestionably fell under the rubric of 404(b) given the issues at trial, and, as the trier of fact, it considered the circumstances of the prior threats for the limited purpose of analyzing Butler's state of mind at the time he made the threatening calls.

operator that he was armed with a knife and felt homicidal. Officers responded and took Butler into custody without incident.

The court carefully considered the evidence and testimony about these matters during the trial. Following the trial, it reviewed the evidentiary record with the aid of the parties' post-trial briefs. Accordingly, the court is now able to issue its findings of fact and conclusions of law and, in so doing, render a verdict.

The court concludes, as a matter of common sense, that Butler undoubtedly suffers from undetermined mental illness and the deleterious effects of chronic substance abuse—both of which make it difficult for him to make rational decisions and, often, to conform his conduct to the law.[5] That much is undeniable based on any objective assessment of his tragic life.

But, under the IDRA, that is insufficient to excuse Butler's criminal acts on the grounds of legal insanity. As explained below, Butler has failed to establish by clear and convincing evidence that, at the time he made threats against the president and vice president, he was incapable of understanding the nature and quality or wrongfulness of his actions. The overwhelming evidence presented at trial proves that, to the contrary, Butler was cognizant of the nature and likely consequences of his threats. Thus, under the modern insanity standard, the court has no choice but to find him guilty on all counts.

---

[5] Indeed, no reasonable person would argue that calling a probation officer from a psychiatric hospital to make threats against the President of the United States is the product of rational thought.

## I.    LEGAL STANDARD

"In a case tried without a jury, the court must find the defendant guilty or not guilty. If a party requests before the finding of guilty or not guilty, the court must state its specific findings of fact in open court or in a written decision or opinion." Fed. R. Crim. P. 23(c). "When . . . a jury trial is waived, the judge weighs the evidence, determines the credibility of the witnesses, and finds the facts." *United States v. Bales*, 813 F.2d 1289, 1293 (4th Cir. 1987); *see* 2 C. Wright, *Federal Practice and Procedure* § 374 (4th ed. 2020); *United States v. Kipp*, No. 3:15-cr-00244-MOC-DSC, 2017 WL 2662983, at *2 (W.D.N.C. June 20, 2017) ("In a bench trial, the court's duty is to . . . choose from among conflicting inferences and conclusions those which the court considers most reasonable."). "The Court has wide discretion to select among conflicting inferences to be drawn from the testimony." *United States v. Higgins*, No. 6:18-cr-10, 2021 WL 342565, at *1 (W.D. Va. Jan. 31, 2021).

## II.    FINDINGS OF FACT

### A.  Pre-Offense Mental Health History

Butler was released from Virginia Beach City Jail on July 14, 2022, where he had been serving a sentence on state charges. (Gov't Ex. 1 at 2.) During the four-month period between his release from jail and the instant offense conduct, he was admitted to at least six different psychiatric inpatient facilities on at least seven separate occasions. (Gov't Ex. 14 at 5, 7–9; Gov't Ex. 23 at 2, 6, 18; Gov't Ex. 24 at 44, 57, 69, 90, 127;[6] Tr. Vol. 1 at 176:13–178:6 [ECF No. 138].) In fact, between July 14 and his arrest on the instant charges on December 8, he

---

[6] Citations to specific pages of Government's Exhibits 23 and 24 refer to the pagination in the bottom right-hand corner of the documents.

appears to have spent most of his time at psychiatric facilities. These periods of hospitalization were prompted by his delusional beliefs about people following him and trying to kill him. (*See* Tr. Vol. 1 at 51:6–52:2, 52:24–53:22; Gov't Ex. 14 at 7.)

Butler believes that since 2008 people have been following him and were trying to kill him. (Tr. Vol. 2 at 8:5–7, 15:4–5 [ECF No. 139].) He believes that these people, whom he refers to as "gang stalkers," are "people that work for the government" in an "off the books, operation run by the government from the FBI, the Secret Service, the CIA and all them" and "take orders from the President." (*Id.* at 14:16–23.) These gang stalkers, according to Butler, are disguised as ordinary people all around him, including doctors, lawyers, police officers, or anyone he happened to pass on the street. (*Id.* at 11:20–25.) The only place where Butler feels that he is safe from gang stalkers is in prison. (*Id.* at 33:10–12; 33:16–17; 50:19–24.) These delusions "about people trying to get him" persisted through his stay at Catawba at the time of the offense conduct. (Gov't Ex. 8 at 27; *see id.* at 19, 33).[7]

Though he first perceived that people were following him in 2008, Butler did not begin to refer to these people as "gang stalkers" until 2018 when he learned the term from another patient at the psychiatric hospital he was in at the time. (Tr. Vol. 2 at 15:22–16:15.) Upon hearing the term, he researched "gang stalkers" on Wikipedia. (*Id.* at 17:6–17.) What he read sounded like what he perceived was happening to him. (*Id.* at 17:16–17; 17:25–18:6.) Thereafter, he adopted the term "gang stalkers" to describe the people he believed were following him.

---

[7] Citations to specific pages of Government's Exhibit 8 refer to the pagination in the filing stamp at the top of the document.

On November 15, 2022, Butler was released from one of his many hospitalizations that had occurred between July and December 2022. (Gov't Ex. 24 at 127, 133.) Upon his release, he took an Uber from the mental hospital to Fairfax, Virginia. (Tr. Vol. 2 at 9:23–10:12.) After exiting the Uber, Butler was sitting in a parking garage in Fairfax when he saw a car backing up in his general direction, which he perceived to be a gang stalker following him. (*Id.* at 10:14–16; 11:6–11.) He then got on a bus and rode to a Safeway supermarket in Fairfax. (*Id.* at 12:15; 12:19–20; 13:15–24.) At the Safeway he again perceived that he was surrounded by gang stalkers. (*Id.* at 14:8–17.) Fearing for his life, he called the police. (*Id.* at 15:1–5.)

Fairfax County Police Officer Christian Vigil was one of the officers who responded to Butler's call at the Safeway. (Tr. Vol. 1 at 173:3–6; 174:3–22.) When she encountered Butler, he was acting paranoid and fidgety. (*Id.* at 175:20–23.) Officer Vigil asked him why he had placed the call, and he told her that he was feeling homicidal and that "there [were] people out to kill him." (*Id.* at 175:8–19.) Two members of the Crisis Intervention Team also responded to the scene and spoke with Butler. (*Id.* at 176:5–10.) As a result of that conversation, Butler was taken back into custody under an emergency custody order. (*Id.* at 176:13–15.) After another interview with a clinician, he was placed under a temporary detention order and taken to Fairfax Hospital. (*Id.* at 176:20–177:25.) Three days later he was transported across the state from Fairfax Hospital to Catawba, where he remained until his arrest on December 8. (*See* Gov't Ex. 8 at 3, 102.)

## B. Offense Conduct

Butler made a series of phone calls to the Virginia Probation and Parole Office between December 1 and December 7, 2022, while he was at Catawba. At the time, Probation Officer

Kelcie Chandler was Butler's supervising probation officer in Virginia Beach. (Tr. Vol. 1 at 31:20–23; 32:2–6.) On December 1, Butler left a voicemail message for Ms. Chandler that is the basis for Count 1 of the Indictment. (*Id.* at 39:14–40:4.) In that message, he threatened to kill President Biden because, "since [Butler] came outta jail, [Ms. Chandler had] been trying to set [Butler] up to get killed." (Gov't Ex. 3A.) He also stated that his "baby mama," his "cousin's baby mama," and his mother were in on the plot to get him killed, and he was "going to put an end to all that" by killing the president. (*Id.*)

Butler also called Shonita Dunston, another probation officer in Virginia Beach, on December 1 and again on December 2.[8] (Tr. Vol. 1 at 60:22; 61:5–11.) In both calls, Butler again threatened to kill President Biden. (Gov't Ex. 14 at 2–3; Gov't Ex. 6A.) In the December 1 call, he stated that "people [were] following him" and "conspiring against him" and that "Ms. Chandler thinks this is a game but [Butler would] show her." (Gov't Ex. 14 at 2–3.) On December 2, Butler left a voicemail explaining that he had to kill the president and vice president was because of how "dirty and crooked" they were, because President Biden was a "liar" and a "thief," and because "[w]e need Trump back in the office." (Gov't Ex. 6A.) He also warned that he would be released from Catawba the following week and had "access to one firearm." (*Id.*) Once released, he would "jump over . . . the White House fence" and kill the president. (*Id.*) He instructed Ms. Dunston to tell Ms. Chandler not to "take [his] threats too lightly" because he was "well connected to get the gun." (*Id.*)

---

[8] Although neither of these calls is the basis for any of the charges in the indictment, evidence of these calls was admitted at trial because they are intrinsic to the charged conduct and therefore not inadmissible under Federal Rule of Evidence 404(b).

After learning of these calls, United States Secret Service Special Agent Jeffrey Norman interviewed Butler at Catawba on December 3. (Tr. Vol. 1 at 148:17–20.) Special Agent Norman asked Butler if he meant what he said in his calls to the probation office about killing the president. (*Id.* at 151:17–19.) Butler responded in the affirmative, stating that "[h]e has to go." (*Id.* at 151:20–21.) He also explained to Special Agent Norman how he would use a MAK-90 assault rifle to jump the White House fence while shooting Secret Service agents so that he could make his way to the White House where he would kill the president. (*Id.* at 151:22–152:5.) He stated he would obtain weapons from a friend, but he would not identify or provide any information about that friend. (*Id.* at 152:15–23.)

Special Agent Norman also asked Butler why he wanted to kill the president. (*Id.* at 155:3–6.) Butler told Special Agent Norman that he was an anarchist, held strong anti-government views, and has an anarchy tattoo on his hand. (*Id.* at 155:3–9.) Additionally, Butler mentioned gang stalkers to Special Agent Norman multiple times, stating that they were following him and trying to kill him and that they could assume the role of a doctor, nurse, or police officer. (*Id.* at 155:14–17.) The agent understood this to be a paranoid belief. (*Id.* at 161:2–7.) Finally, Butler told Special Agent Norman about a previous threat he made to President Obama in 2012. (*Id.* at 156:21–24.) Related to that threat, Butler plead guilty in 2014 to threatening then-President Obama and then-Vice President Biden. (*See* Gov't Ex. 9.) Butler's statements to Special Agent Norman are the basis for Count 2 of the Indictment.

On December 7, Butler left three voicemails with the probation office, which are the basis for Counts 3 through 7 of the Indictment. He left the first two voicemails for Ms. Chandler and the third for Ms. Dunston. (Gov't Exs. 4A, 5A, 7A.) In the first voicemail, he

expressed frustration that his threats were being taken lightly and reiterated his plan to jump the fence of the South Lawn of the White House and kill President Biden, which he said would be on the news. (Gov't Ex. 4A.) He said he would also "have a Facebook Live" during the event.  (*Id.*) In that voicemail, he also threatened First Lady Jill Biden and Vice President Harris. (*Id.*)

In the second voicemail, Butler stated he would "go on Facebook Live" while he was killing the president. (Gov't Ex. 5A.) He again threated Jill Biden and Vice President Harris and declared that, if he couldn't get to the "South Lawn at a certain time," he would "take out Norfolk Federal Courthouse Building" and shoot U.S. Marshals or "take out Secret Service." (*Id.*) He also made vague threats about attacking power grids, emphasized that he was serious about killing the president, and stated that his threats were being taken too lightly. (*Id.*)

In the third voicemail, in addition to threatening the president, first lady, and vice president, he threatened President Biden's children, including his "distant kids." (Gov't Ex. 7A.) In closing, he emphasized that he had a "definite plan," which he would not continue to share, especially not with Special Agent Norman, whom he asserted he may have to kill as well. (*Id.*)

At trial, Butler testified that he threatened President Biden and clearly identified himself in the voicemail messages because he "wanted to be locked up so [he] could be safe and sound" and so that he "could be away from the gang stalkers." (Tr. Vol. 2 at 33:10–12; *see also id.* at 49:8–15.) He testified that he wanted to be sent to jail where he felt safer, and that he "wanted to go to jail forever." (*Id.* at 61:19; *see id.* at 33:16; 50:18–24.) He did not want to be returned to Virginia Beach after his release from Catawba because he believed that the gang stalkers

were headquartered in Virginia Beach and they would kill him if he were in Virginia Beach. (*Id.* at 37:25–38:7.)

Most significantly, Butler also stated that he knew making a threat was wrong and a crime that would land him in jail. (*Id.* at 61:8–10, 61:24–62:1.) And he testified that, after speaking to Special Agent Norman following his first three calls to the probation office, he knew that law enforcement would "show up" to interview him after he made threats. (*Id.* at 57:16–21.) He maintained that he had "no idea" why he threatened the president, except for his desire to "feel safe" and have "some protection" in the community. (*Id.* at 77:19–23.) When asked whether he was going to execute his plan to kill the president, Butler emphatically responded, "Never." (*Id.* at 56:13–14; *see also id.* at 77:11–18.)

### C. Expert Testimony and Related Medical Evidence

Three experts testified at trial: (1) Nurse Practitioner Ry Bergum, Butler's treatment provider at Catawba, who testified as a treating provider about Butler's mental-health diagnoses and his treatment at Catawba; (2) Dr. Lauren Schumacher, the government's expert in forensic psychology; and (3) Dr. Jonathan DeRight, Butler's expert in clinical psychology.

### i.    Nurse Practitioner Ry Bergum

Mr. Bergum first evaluated Butler on November 18—the day he was admitted to Catawba. (Tr. Vol. 1 at 90:13–16.) Based on that evaluation, Mr. Bergum opined that Butler was still intoxicated at the time, which was supported by the fact that Butler tested positive for methamphetamine upon admission.[9] (*Id.* at 93:7–12; 109:12–17.) Mr. Bergum testified that

---

[9] Butler did not use any illicit substances while at Catawba and his urine screen was negative as of at least November 21. (Tr. Vol. 1 at 112:3–5, 128:19–20.) It is undisputed that Butler was not intoxicated at the time of the offense conduct.

Butler told him during the evaluation that "people [were] after him in the Virginia Beach area related to this credit[-]card fraud scheme."[10] (*Id.* at 96:22–25.) Mr. Bergum also opined that Butler was not paranoid of hospital workers, security staff, or other patients, and that Butler did not present with a thought disorder because his paranoia about returning to Virginia Beach was concrete and reality based—namely, about his purported former criminal associates related to the credit-card scheme. (*Id.* at 100:2–17.)

At the time of Butler's discharge, Mr. Bergum diagnosed Butler with malingering and anti-social personality disorder. (*Id.* at 106:6–20.) He also listed "unspecified schizophrenia spectrum and other psychotic disorder" as a "rule-out" diagnosis, meaning that he did not see strong evidence of such a disorder in Butler's presentation but could not rule it out. (*Id.* at 107:3–17.) He testified that, throughout Butler's time at Catawba, he did not perceive Butler to meet the criteria for schizophrenia or any other psychotic disorder. (*Id.* at 107:18–24.)

Based on the treatment records from his time at Catawba, other providers who evaluated and treated Butler disagreed with Mr. Bergum's assessment. On November 18, one provider noted that Butler was "exhibiting psychiatric instability." (Gov't Ex. 8 at 15.) Another noted that his thought content was "abnormal" based on his "persecutory delusions" and listed "unspecified schizophrenia spectrum and other psychotic disorder" as the first diagnosis under the "Assessment/Plan" heading.[11] (*Id.* at 19, 20.) A third provider noted that he "expressed paranoid delusions about people trying to get him." (*Id.* at 27.) A fourth provider—

---

[10] In his own testimony, Butler denies telling Mr. Bergum this. (Tr. Vol. 2 at 30:12–20, 38:18–39:5.)

[11] Mr. Bergum explained in his testimony that the order of diagnoses in this section of a medical record is significant as it indicates the prevalence of each listed diagnosis in the patient's presentation. (Tr. Vol. 1 at 106:21–24.) The diagnosis listed first "would be the most prevalent." (*Id.*)

psychologist Alicia Saunders, who assessed Butler on November 21—documented that Butler "perseverated upon the fact that others want to kill him and stated he will kill them first," and that Butler had "a fixed delusion that the officers and others in the hallway are trying to kill him and he will kill them first." (*Id.* at 33.)

Mr. Bergum also testified to his personal observations of Butler during his time at Catawba. According to Mr. Bergum, after Butler was told that he would have to return to Virginia Beach once he was discharged from Catawba, Butler "began displaying increasingly bizarre behaviors in an apparent attempt to affect his discharge disposition." (Tr. Vol. 1 at 100:21–25.) For "a period of . . . a day or two," Butler was observed "walking back and forth in the hallway with a sheet around his body and a towel around his head." (*Id.* at 102:1–4.) This behavior immediately ceased after only a short time. (*Id.* at 102:4–5.) Mr. Bergum explained that this type of behavior is often observed in patients with schizophrenia "who have multiple layers of clothes on" or have "[b]lankets wrapped around them" and "towels around their head" because "they have a hard time with temperature regulation of their bodies," so they engage in this behavior "in an attempt to regulate the body temperature." (*Id.* at 102:15–25.) But, in Butler's case, Mr. Bergum did not believe this behavior to be indicative of schizophrenia because it did not begin until Butler was told he would be sent back to Virginia Beach and "abruptly went away" when hospital staff "didn't respond." (*Id.* at 103:4–10.) Mr. Bergum explained that in a schizophrenic patient, such behaviors would be observed consistently; they would not abruptly start and end as in Mr. Butler's case. (*Id.* at 103:11–18.)[12]

---

[12] The court's observations of Butler at the time of Mr. Bergum's testimony about these behaviors is consistent with Mr. Bergum's impression that these behaviors were manipulative acts of showmanship rather than true symptoms of schizophrenia. At this point in the trial, Butler removed his arms from the arm holes of the short-

### ii. Dr. Lauren Schumacher

Dr. Lauren Schumacher, the government's expert, evaluated Butler for competency twice between February 2023 and June 2024 at the Federal Detention Center ("FDC") in Miami, Florida. During the second evaluation, she also evaluated his sanity at the time of the offense. (Tr. Vol. 2 at 101:17–18.) In addition to extensively interviewing Butler and conducting psychological testing, she reviewed telephone calls Butler placed while at FDC Miami, reviewed his medical records,[13] and spoke to FDC staff about their interactions with Butler. (*Id.* at 83:5–17.)

Among the psychological tests that Dr. Schumacher administered during the first competency evaluation were the Minnesota Multiphasic Inventory–3rd Edition ("MMPI-3"), the Personality Assessment Inventory ("PAI"), and the Structured Interview of Reported Symptoms ("SIRS-2"). (*Id.* at 87:24–88:4.) The SIRS-2 is designed to evaluate whether someone is feigning psychiatric symptoms. (*Id.* at 89:6–12.) Butler's responses on the SIRS-2 indicated that he "was attempting to feign or exaggerate psychiatric symptoms." (*Id.* at 90:2–6.) The results of the MMPI-3 and PAI were uninterpretable due to Butler's inconsistency in responding to questions, lack of motivation to complete the tests, and answering mostly "true" to the 300-plus question MMPI-3 test. (*Id.* at 88:19–89:5.)

---

sleeved shirt he was wearing and tucked his arms inside his shirt, wrapped around his body, as though cold. These antics were marked at this point in Mr. Bergum's testimony, but the court did not observe the same conduct later that day, and it had subsided completely on the second day of trial.

[13] At the time of her evaluations, Dr. Schumacher only reviewed Butler's records from Catawba, but prior to testifying, she reviewed the entirety of the records, which date back to 2008, and the opinions she expressed at trial reflect her review of the entirety of those voluminous records. (Tr. Vol. 2 at 109:14–23.) She testified that her review of the records was consistent with the diagnoses she made during her evaluations. (*Id.* at 111:11–15, 113:2–4.)

Dr. Schumacher's subjective evaluation of Butler at that time also supported a diagnosis of malingering, which is "the intentional exaggeration or fabrication of symptoms for external gain." (*Id.* at 91:15–17; *see id.* at 90:7–16.) Though Butler reported "concerns about gang stalkers and his safety and government officials" to Dr. Schumacher during formal evaluations, the FDC staff that Dr. Schumacher spoke to uniformly reported that they had not heard him use that term, and he had not "voiced any general safety-related concerns" to them. (*Id.* at 90:9–24.) Nor did he mention gang stalkers during any of the calls Dr. Schumacher reviewed that Butler placed to friends, family, and acquaintances while he was at FDC Miami. (*Id.* at 107:13–16.) Butler was also "functioning adequately in his housing unit" and "[t]here were no reports from staff that he was evidencing any signs of paranoia or any acute concerns in that regard." (*Id.* at 90:13–16.)

At the conclusion of the first evaluation, Dr. Schumacher diagnosed Butler as malingering. (*Id.* at 91:9–15.) She opined that Butler did not suffer from "any sort of delusional thinking." (*Id.* at 92:19–23.) Rather, she believes he was feigning the delusions relating to gang stalkers for the purpose of achieving the external gain of a change in housing, meaning he sought to avoid being homeless or returning to Virginia Beach by feigning his delusions so that he would be institutionalized or incarcerated instead. (*Id.* at 106:1–16.) In support of her diagnosis, she pointed to the fact that Butler's delusional symptoms seemed to appear when she spoke with him and "would rapidly terminate once he no longer perceived he was being evaluated by a mental[-]health professional." (*Id.* at 93:5–8.) In his records, "these symptoms

- 16 -

would abruptly onset when he was seeking hospitalization or some sort of resource, and then they would terminate relatively quickly." (*Id.* at 93:9–11.)[14]

Dr. Schumacher also diagnosed Butler with antisocial personality disorder and "other specified personality disorder with borderline and paranoid features." (*Id.* at 94:7–10.) She explained that these diagnoses were supported by his persistent involvement in the criminal justice system, his "tendency to lash out at others," his problems in school beginning at an early age, and his "difficulties in interpersonal relationships with others." (*Id.* at 94:18–95:15; 96:9–15.) She assigned him features of paranoid personality disorder because "pervasively throughout his lifespan he's had a general mistrust of others and suspiciousness of others," but she did not believe that that mistrust rose "to the level of a delusional belief." (*Id.* at 96:16–20.) Dr. Schumacher also explained that personality disorders typically do not qualify as a severe mental disease or defect because they don't "interfere with the individual's understanding of reality" or "their ability to engage in intentional behaviors." (*Id.* at 95:23–96:5.)

In addition, Dr. Schumacher assigned mild cannabis-use disorder and severe cocaine-use disorder. (*Id.* at 96:22–97:2; 97:13–15; 97:18.) She explained that cocaine use can cause paranoia and delusions, and "at least 80 percent of his hospitalizations were associated with his acute intoxication or use of substances." (*Id.* at 109:7–9.) She also opined that Butler's

---

[14] Related to Dr. Schumacher's subjective observations of what she perceived as Butler feigning delusional symptoms, the court observes that Butler displayed some manipulative tendencies during trial. In addition to his behavior during Mr. Bergum's testimony about temperature regulation, Butler was markedly more combative and evasive on cross-examination than on direct examination by his own counsel. (*See, e.g., id.* at 42:17–25; 43:22–23; 47:1–48:4.) On cross, rather than giving a direct answer, Butler several times accused the prosecutor of such things as using "tactics," not allowing him to explain himself, or conflating his answers. (*See, e.g., id.* at 36:24, 47:19–21, 47:1–48:4; 50:14–16.) In addition to evading and fighting individual questions, Butler interrupted and attempted to derail the government's line of questioning. (*See, e.g., id.* at 42:6–13.)

medical records "suggest that periods in which Mr. Butler was acutely paranoid or agitated were solely associated with intoxication." (*Id.* at 98:17–20; 99:16–19.) She viewed this as further evidence that he was not suffering from genuine delusions. (*Id.* at 99:15.)

Finally, Dr. Schumacher assigned him a diagnosis of "unspecified schizophrenia spectrum or other psychotic disorder." (*Id.* at 97:4–5.) She explained that the "unspecified" characterization meant that there was contradictory evidence as to this diagnosis and, though she could not "definitively say that he has never experienced psychosis," she also did not "have enough information to conclusively say that he has." (*Id.* at 99:24–100:19.) In her professional opinion, she opined that Butler did not suffer from schizophrenia or schizoaffective disorder at the time of her first evaluation. (*Id.* at 100:20–23.)

During Dr. Schumacher's second evaluation, Butler was "largely uncooperative," especially at first when he flatly refused to meet with Dr. Schumacher, but Dr. Schumacher was later able to meet with Butler in the company of defense counsel. (*Id.* at 103:3–13.) Even then, Butler asserted that "he would not cooperate or speak to any government personnel" and began using profanities toward Dr. Schumacher until defense counsel "terminated the interaction." (*Id.* at 103:14–19.) During the final three weeks of the 45-day evaluation period, Butler often requested to meet with Dr. Schumacher but "continued to refuse to complete formal testing or formal interviewing." (*Id.* at 103:22–104:3.) Instead, he spoke to Dr. Schumacher "about topics that he perceived to be of importance," which included "that he wanted to be incarcerated indefinitely," that he wanted to return to this district to "resolve his legal case," and his beliefs about gang stalkers. (*Id.* at 104:4–21.)

- 18 -

At the end of the second evaluation period, Dr. Schumacher's conclusions and diagnoses remained largely the same as those from the first evaluation period. (*Id.* at 105:10.) Though she noted in one of her reports that Butler's thought content was reflective of persecutory ideation relating to his belief that he is being followed by government employees, she asserted that persecutory ideation does not equate to a delusion. (*Id.* at 127:3–12.) She maintained her view that Butler did not suffer from delusional thinking or a psychotic disorder and did not suffer from a severe mental disease or defect. (*Id.* at 111:7–15.)

### iii.    Dr. Jonathan DeRight

Butler retained Dr. Jonathan DeRight to determine whether Butler experienced a mental-health issue that affected his conduct at the time of the offense, including whether he was legally sane at that time. (Tr. Vol. 1 at 183:19–184:1.)

Dr. DeRight met with Butler in January 2024 in a private conference room in the prison in which Butler was held at the time for a three-hour evaluation. (*Id.* at 184:2–10.) In addition to interviewing Butler, Dr. DeRight listened to the voicemails that precipitated the Indictment, reviewed Butler's medical records dating back to 2008, reviewed Dr. Schumacher's reports, and administered the Miller Forensic Assessment of Symptoms Test ("M-FAST"). (*Id.* at 187:24–188:2; 188:21–25; 221:16–25.)

The purpose of the M-FAST "is to rule in or out the possibility of purposeful symptom exaggeration." (*Id.* at 190:4–5.) It is a "screening instrument" that is "not meant to be a comprehensive instrument in nature." (*Id.* at 189:12–13.) Rather, it allows psychologists to determine, in a "scientific way," whether further follow-up testing is required by gauging "how likely it is that a more comprehensive instrument would find that this person is feigning." (*Id.*

at 189:14–16; 190:24–191:1.) Based on Butler's responses to the M-FAST, Dr. DeRight assessed that there was a 96% chance that Butler was not feigning. (*Id.* at 191:2.) Therefore, Dr. DeRight concluded that Butler was not exaggerating or feigning symptoms and that more comprehensive testing was not required. (*Id.* at 189:24–25.)

During the evaluation, Butler presented to Dr. DeRight as "very matter of fact" and he referenced the gang stalkers "in almost every sentence." (*Id.* at 184:20–22.) Initially, Dr. DeRight found it difficult to get a word in, and he described Butler's thought process as "disorganized" and not reality based. (*Id.* at 184:23–185:7; 192:15–17.) Though Dr. DeRight did not believe that Butler was trying to be uncooperative, Dr. DeRight found that Butler's symptom presentation rendered him untestable at the time of the evaluation, so Dr. DeRight did not administer a cognitive test such as the PAI or MMPI. (*Id.* at 189:9–11, 192:3–7.) When Dr. DeRight asked Butler to discuss his mental-health problems, Butler responded, "I don't have mental[-]health problems. I have gang stalker problems." (*Id.* at 193:14–19.)

Based on his evaluation, and contrary to Dr. Schumacher's report, Dr. DeRight concluded that Butler was suffering from delusions and that "his delusional content"—that "a group of people are trying to follow him and attack him"—"has been remarkably similar going back . . . at least 14 or 16 years now." (*Id.* at 195:9–15.) Dr. DeRight explained that a delusion is a fixed false belief, meaning that "no matter what evidence is shown to you, the belief is not going to be changed." (*Id.* at 194:19–21.) It is a thought disorder that affects whether someone's thinking is reality-based. (*Id.* at 196:4–9.)

Dr. DeRight diagnosed Butler with schizophrenia spectrum disorder. (*Id.* at 197:1.) He explained that schizophrenia is characterized by delusions, hallucinations, or a disorganized

thought process, coupled with "a lack of energy or lack of interest in the world." (*Id.* at 197:9–14.) If also combined with a manic or hypomanic episode, a more specific diagnosis would be schizoaffective disorder. (*Id.* at 197:16–18.) In Butler's case, Dr. DeRight observed that his beliefs about gang stalkers were "unwavering," regardless of what evidence was presented to him, that "his thought process was highly disorganized," and that Butler endorsed "some negative symptoms, such as lack of motivation." (*Id.* at 197:22–198:3.)

Further, Dr. DeRight testified that he would characterize schizophrenia spectrum disorder as a severe mental disease or defect. (*Id.* at 198:23–25.) He explained that generally it would be "very unusual for someone to be experiencing active symptoms of schizophrenia and it not be severe" because it is "a very severe, debilitating condition"; specifically, with respect to Butler, it was so severe that "he thinks the only thing he can do is something very extreme"—threating the president—"to get the attention of someone that he thinks could possibly stop it or to at least put him in a place where he feels safe." (*Id.* at 199:2–9.)

Dr. DeRight also diagnosed Butler with factitious disorder, which is "a simulation of a symptom for the purpose of gaining attention in some way." (*Id.* at 205:16–21.) Dr. DeRight explained that although factitious disorder it is related to malingering, it differs in that the goal of malingering is "secondary gain, either money or avoiding prosecution or something like that, whereas the goal of factious disorder is primary gain; safety, for example, or attention." (*Id.* at 205:23–206:1.) Dr. DeRight opined that Butler was not malingering, but rather that his homicidal ideation "was a product of factitious disorder." (*Id.* at 206:2–10.) He explained that in his view, Butler was pursuing "the end goal of getting attention" and "perhaps placement

in a certain way"—"[h]is goal is to be in jail where he says in plenty of his records that that's where he feels safe and wants to be." (*Id.* at 206:18–207:5.)

Dr. DeRight explained that the diagnosis of factitious disorder was not inconsistent with Butler's M-FAST results because the M-FAST tests whether someone is "feigning psychosis or some kind of unusual thought disorder." (*Id.* at 208:7–14.) Butler was feigning homicidal ideation, but the underlying delusion (his belief about gang stalkers) was not feigned. (*Id.*) Though homicidal ideation is not itself a disorder, it was a symptom of Butler's underlying mental illness. (*Id.* at 208:16–22.) Butler's mental illness caused him to believe that his life was in danger and gang stalkers were following him. (*Id.* at 211:25–212:3.) From his experiences in the criminal justice system, he had learned "what to say to potentially get him in jail." (*Id.* at 212:3–5.) According to Dr. DeRight, he therefore feigned homicidal ideation in threatening the president—conduct he had learned would result in his incarceration—because his mental illness caused him to seek the perceived safety of prison. (*See id.* at 212:25–213:7.)

Dr. DeRight also testified that someone with factitious disorder who was fabricating "a belief or symptom for the end result of gaining attention" would have an awareness of what they are doing and what consequences their conduct would have. (*Id.* at 207:18–25.) In other words, "[T]hey know they are making up a symptom." (*Id.* at 208:4.)

In short, the upshot of Dr. DeRight's testimony is that Butler suffered from delusions and schizophrenia, with a secondary diagnosis of factitious disorder. He opined that, collectively, these "mental diseases or defects" were severe and caused him to feign homicidal ideation. Dr. DeRight's testimony thus supports the conclusion that Butler's mental illness is the direct cause of the offense conduct.

### iv.  The Court's Findings as to Butler's Mental State

Ultimately, the court is not fully convinced by either Dr. Schumacher or Dr. DeRight. In the court's mind, neither account tells the whole story. Rather, the court believes the truth lies somewhere in the middle between the two experts' opinions. The court finds that Butler had genuine delusional beliefs about gang stalkers and that the gang stalkers are real to Butler. At the same time, the court finds that there is some evidence of malingering, though it is beyond the court's expertise to determine whether it suffices for a proper diagnosis of malingering.

In the same vein, the court will not endeavor to resolve Dr. DeRight and Dr. Schumacher's dispute as to whether malingering or factitious disorder—and relatedly the concepts of external or internal gain—more appropriately apply to Butler. (*Compare* Tr. Vol. 1 at 206:2–25, 215:10–23, *and* Tr. Vol. 2 at 180:20–183:5, *with* Tr. Vol. 2 at 113:20–115:12.) That is a task far beyond the court's expertise. As Dr. DeRight testified, even trained clinicians regularly disagree about the specific diagnosis underlying a set of symptoms. (Tr. Vol. 1 at 294:7–17.) Here, the court need neither resolve the dispute about malingering and factitious disorder nor venture to ascertain whether Butler suffered from schizophrenia spectrum disorder, schizoaffective disorder, anti-personality disorder, or some combination thereof. Whatever their medical or psychological cause, the court finds that, at the time of the offense conduct, Butler suffered from delusions about gang stalkers, who he believed were trying to kill him. Affixing a specific medical label to those delusional symptoms would not alter the court's factual finding (or the ultimate outcome).

The court also does not agree with Dr. Schumacher that Butler's delusions were solely the product of his severe cocaine use disorder. While the court does credit that diagnosis and considers it probable that Butler's cocaine use exacerbated his pre-existing delusions, it finds that Butler suffered from genuine delusions independent of his cocaine use. For example, there is no indication in the records from Northern Virginia Mental Health Institute that Butler was under the influence of cocaine or any other substance when he was there in October 2022, yet the records describe that he was experiencing delusions about people following him at the time. (*See* Gov't Ex. 24 at 57.)

The court also does not find persuasive the government's argument that evidence of Butler's delusions should be discredited because that evidence is exclusively based on Butler's self-serving statements and is not supported by his discharge records. (Gov't Reply at 4 [ECF No. 147].) It is not clear to the court where one is to obtain information about Butler's delusions if not from the patient himself. A delusion, by its nature, is something perceived only by that person, so one must rely on that person's own statements. The government's argument, like Dr. Schumacher's testimony, discounts Butler's own statements too severely and, like Dr. DeRight, cherry-picks the medical-record evidence. That is not to say that the court finds Butler to be a reliable narrator. But viewing the evidence in its totality, the court finds that Butler was suffering from genuine delusional beliefs about gang stalkers at the time of the offense conduct.

### D. Butler's Motives in Threatening the President

Based on Butler's testimony, the court's observations of Butler during trial, Butler's mental-health history showing a consistent pattern of persecutory beliefs, and the expert

testimony, the court finds that the threatening phone calls Butler made were motivated by his beliefs about and fear of gang stalkers and his fear of being harmed by gang stalkers if he were to return to Virginia Beach. He acted as he did because he sought the perceived safety of prison, where he felt he would be protected from gang stalkers. The court is convinced that Butler's mental illness is at the root of the thought process that led him to make threats against the president; those actions were not the product of rational decision making.

The court rejects the government's theory that Butler's actions were politically motivated because he only threatened Democrats. (*See* Gov't Post-Trial Br. at 30.) While the court agrees with the government that Butler appears to prefer President Trump over Democrats, his conduct was not motivated by his political preferences. Nor does the manipulative conduct the court observed from Butler during trial undermine the court's factual finding that Butler acted as he did out of fear of gang stalkers. Rather, the court finds that all of Butler's actions—including his manipulative conduct—were motivated by his desire for personal safety from the gang stalkers.

The timeline of Butler's conduct and the timing of when he learned that he would be returned to Virginia Beach upon discharge from Catawba also support the court's finding. Mr. Bergum informed Butler on November 30 that he would be returned to Virginia Beach upon discharge. (Tr. Vol. 1 at 98:19–25.) Then, according to Mr. Bergum's testimony, Butler engaged in "bizarre behaviors"—walking around with a sheet wrapped "around his body and a towel around his head"—for a day or two, or until approximately December 1. (*Id.* at 101:20– 102:6.) When this behavior yielded no reaction or result, Butler stopped behaving in this manner but escalated his efforts to avoid his return to Virginia Beach, namely by placing calls

to the probation office in which he threatened the president, with the first call placed on December 1. (*See id.* at 39:14–40:4; 103:4–10.)

The court does not credit Mr. Bergum's testimony that Butler did not want to return to Virginia Beach because "people [were] after [Butler] in the Virginia Beach area related to this credit[-]card fraud scheme." (Tr. Vol. 1 at 96:22–25.) That is not to say that the court believes that Mr. Bergum's testimony was untruthful; rather, the court believes that Mr. Bergum misunderstood who Butler believed was persecuting him in Virginia Beach. From the court's own observations of Butler's testimony, the court recognizes that Butler's explanations can be incoherent and scattered. Coupled with the fact that Butler was recently released from prison in the Virginia Beach area, it is not unreasonable to understand his persecutory beliefs as relating to his criminal past. The court's view that Mr. Bergum misunderstood the basis for Butler's fear of persecution is strengthened by the fact that there is no evidence in the record that Butler ever engaged in credit-card fraud or any other fraud scheme.[15]

## III.    CONCLUSIONS OF LAW

### A. Butler Violated 18 U.S.C. § 871

The Indictment charges Butler with seven counts of violating 18 U.S.C. § 871, which prohibits "knowingly and willfully" making "any threat to take the life of, to kidnap, or to

---

[15] Mr. Bergum's understanding that Butler was afraid of criminal associates related to a credit-card scheme is also contradicted by the assessment notes of Ms. Saunders, who evaluated Butler at Catawba on November 21. Ms. Saunders noted that, during the assessment, Butler was "preoccupied" and had "a fixed delusion that the officers and others in the hallway are trying to kill him and he will kill them first." (Gov'ts Ex. 8 at 33.) This note is consistent with Butler's asserted belief that gang stalkers can take on the guise of doctors, police officers, or any other person. It is not consistent with Mr. Bergum's testimony about criminal associates. To reconcile this note with Mr. Bergum's testimony, the officers at a psychiatric hospital in Salem, Virginia, would have to be Butler's former criminal associates from Virginia Beach, which makes little sense.

inflict bodily harm upon" the president or vice president of the United States. 18 U.S.C. § 871(a). The elements of that offense, as relevant here, are (1) that the defendant said the words alleged in the Indictment to be a threat to kill, to kidnap, or to inflict bodily harm upon the president or vice president of the United States, (2) that the words were a true threat, and (3) that the defendant made the threat knowingly and willfully. *See* 18 U.S.C. § 871(a); *United States v. Patillo*, 431 F.2d 293, 295 (4th Cir. 1970). Butler does not dispute that the first and third element are satisfied.[16] (*See* Def. Br. at 44 [ECF No. 146].) He contends, however, that the government did not prove beyond a reasonable doubt that the statements made were true threats. (*Id.*)

In *Counterman v. Colorado*, the Supreme Court clarified that, in a true-threats case, the government must not only prove that a statement is a true threat based on its objective content, but also that the defendant made the threat with the requisite *mens rea*, meaning that "the defendant had some understanding of his statements' threatening character." 600 U.S. 66, 73 (2023). Following *Counterman*, to prove that a statement is a true threat, the government must prove that (1) "a reasonable recipient who is familiar with the circumstances would interpret [the statement] as a serious expression of an intent to do harm," *United States v. White*, 810 F.3d 212, 219 (4th Cir. 2016), and (2) "the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening violence," *Counterman*, 600 U.S. at 69. *See also In re: Rendelman*, 129 F.4th 248, 252–254 (4th Cir. 2025).

---

[16] Even if Butler had not conceded these two elements, the government introduced ample evidence at trial to prove these two elements beyond a reasonable doubt. Butler himself testified that he made the calls and spoke to Special Agent Norman, and there is no basis to believe that any of the statements were made accidentally, as opposed to knowingly and willfully.

The *mens rea* requirement for a true threat under § 871(a) is more specific under long-established Fourth Circuit precedent. Where "a true threat against the person of the President is uttered without communication to the President intended, the threat can form a basis for conviction under the terms of Section 871(a) only if made with a present intention to do injury to the President." *Patillo*, 431 F.3d at 297–98. Alternatively, § 871(a) is satisfied if a true threat is made with intent to restrict the movements of the president. *United States v. Patillo*, 438 F.2d 13, 16 (4th Cir. 1971) (en banc). Importantly, the trier of fact may infer intent to restrict the president's movements "from the nature of the publication of the threat, i.e., whether the person making the threat might reasonably anticipate that it would be transmitted to law enforcement officers and others charged with the security of the President." *Id.*

Intent to restrict the president's movements will necessarily satisfy the *Counterman mens rea* requirement. As a matter of common sense, a threat "would be transmitted to law enforcement officers and others charged with the security of the President," *id.*, only if it is "viewed as threatening violence," *Counterman*, 600 U.S. at 69, against the president. And if a person "might reasonably anticipate that" the threat will be transmitted to law enforcement, *Patillo*, 438 F.2d at 16, but makes the threat anyway because they intend to restrict the President's movements, then doing so evinces a conscious disregard for the substantial risk that the statement will be viewed as threatening violence, *see Counterman*, 600 U.S. at 69.

Butler argues that the circumstances in which he made the statements charged in the indictment are such that a reasonable recipient would not view them as a serious expression of intent to do harm. (Def. Br. at 44.) He points out that the calls were "all made from a mental hospital" where he was "receiving treatment that included antipsychotic medication," and he

characterizes the messages as "rambling, streams of consciousness" that "lacked clarity or organized thought." (*Id.*) While true, these facts do not eradicate the objectively threatening nature of the statements.

Butler's voicemails may have been rambling and incoherent at times, but they are crystal clear and consistent about one thing: Butler was going to kill the president and vice president. He says so repeatedly—at least 11 times across the four charged voicemail messages. And he said as much when Special Agent Norman interviewed him. Special Agent Norman described Butler as "very clear and concise. He had a plan. He appeared focused." (Tr. Vol. 1 at 157:15–16.) Further, Butler repeatedly asserted that his statements should be viewed as serious expressions of an intent to do harm, emphasizing throughout the voicemail messages that he was "still going to follow through with the plan," that his probation officer should not take his "threats too lightly," that he would "really kill" the president, that he wasn't "playing a game," that he would show his probation officer how serious he was, and that his "bluff" should not be taken "lightly." (Gov't Ex. 4A; Gov't Ex. 5A; Gov't Ex. 6A.) Accordingly, the court concludes that Butler's statements satisfy the objective prong of the true-threat test.

With respect to the subjective prong, Butler contends that he "had no motive to actually kill the President or Vice President." (Def. Br. at 46.) But he concedes that he "knew his calls would be communicated to law enforcement, because he called the probation officers, who are considered law enforcement officers," and he "knew he was interviewed by Secret Service Special Agent Norman." (*Id.*) The subjective prong of the true-threat test in a § 871(a) case is satisfied if "the person making the threat might reasonably anticipate that it would be transmitted to law enforcement officers." *Patillo*, 438 F.2d at 16. Butler therefore concedes

that this prong is satisfied.[17] Further, based on Butler's repeated statements emphasizing that he was serious about his threat to kill the president and vice president, the court has no doubt that he intended that law enforcement view his statements as threatening violence. Because the statements evince the more culpable *mens rea* of purpose to achieve the desired result, they easily satisfy *Counterman*'s less demanding recklessness standard. *See Counterman*, 600 U.S. at 78–79. Consequently, the court finds that the Government has proven all elements of the charged offenses beyond a reasonable doubt.

### B. Butler Is Not Legally Insane

The IDRA, enacted in 1984, codified the affirmative defense of insanity. *See Dixon v. United States*, 548 U.S. 1, 12 (2006). It provides that "[i]t is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts." 18 U.S.C. § 17(a). It also places the burden of proving insanity by clear and convincing evidence on the defendant. *Id.* § 17(b). Clear and convincing evidence is "an 'intermediate standard' of proof: the 'clear and convincing' standard lies somewhere between 'proof by a preponderance of the evidence' and 'proof beyond a reasonable doubt.'" *United States v. Owens*, 854 F.2d 432, 436 n.8 (11th Cir. 1988) (quoting *Addington v. Texas*, 441 U.S. 418, 424 (1979)).

The insanity defense has three elements: (1) whether, at the time of the offense, the defendant suffered from a severe mental disease or defect; (2) whether that severe mental

---

[17] Even if Butler had not conceded as much, the evidence proves beyond a reasonable doubt that Butler could reasonably anticipate that his call would be transmitted to law enforcement officers, since it was placed to a law enforcement officer.

disease or defect caused the defendant to commit the offense; and (3) whether the defendant "was unable to appreciate the nature and quality or the wrongfulness of his acts." § 17(a); *see United States v. Turner*, 61 F.4th 866, 882 & n.58 (11th Cir. 2023).

As explained above, the court finds as a fact that Butler suffered from genuine delusional beliefs about gang stalkers. Though there is conflicting evidence in the record, the court finds that Butler has proven by clear and convincing evidence that he suffers from these delusions. "A mental disease or defect is severe when it is characterized by a mental state that involves hallucinations or delusions." *United States v. Long*, 562 F.3d 325, 334 (5th Cir. 2009). The court also finds as a fact that the offense conduct was motivated by Butler's delusional beliefs. In other words, Butler's severe mental disease or defect cased Butler to commit the offense. Therefore, Butler has met the first two elements of the insanity defense.

But the court must still find Butler is not legally insane because—by his own and his own expert's admission—he understood the nature and quality as well as the wrongfulness of his actions. Not only did Butler understand that he was committing a crime, but he also acted as he did precisely because he understood the criminal nature of his conduct. By his own admission, Butler threatened the president and vice president because he "wanted to go to jail forever." (Tr. Vol. 2 at 61:19.) Incarceration is the inherent consequence for serious criminal conduct and, based on his 2014 conviction for threatening the president, Butler knew that doing so would result in his incarceration. (*See id.* at 40:11–41:20.) Similarly, Butler's expert, Dr. DeRight, diagnosed Butler with factitious disorder and testified that factitious disorder caused his feigned homicidal ideation, including his threats of the president and vice president. (Tr. Vol. 1 at 212:25–213:7.) He explained that someone with factitious disorder fabricating a

belief or symptom, similar to Butler's presentation, would nonetheless have an awareness of what they are doing and what the resulting consequences would be. (*Id.* at 207:18–25.) That's *why* they do what they do. Accordingly, Butler's own evidence proves that he cannot satisfy the third element of the insanity defense because it demonstrates that he knew that what he was doing was wrongful and criminal.

The court cannot agree with Butler's argument that he understood his conduct to be a crime only because, at the time of that testimony, "he had been in jail and prison for two years, evaluated three times by two different psychologists, and appointed three different attorneys" and therefore "could certainly surmise that his actions violated the law by the time he testified." (Def. Br. at 60.) Rather, the court finds that Butler understood the wrongfulness of his conduct and understood he was committing a crime at the time of the offense. In fact, Butler was motivated to commit the offense by the very fact of the conduct's criminal nature, or more specifically, the attendant punishment. He wanted to go to prison because he felt he would be safe from gang stalkers there. He pursued the chosen course of conduct because it was a crime and because he knew committing crimes would land him in prison. Accordingly, he understood the nature, quality, and wrongfulness of his conduct at the time of the offense.

Likewise, the court is unpersuaded that Butler's lack of evasiveness is in any way probative of whether he understood the wrongfulness of his conduct. (*See* Def. Br. at 60–61.) To be sure, someone who knows they committed a crime will often try to hide that fact to evade the consequences of their conduct. But Butler did not seek to evade going to jail as most criminal defendants do. His lack of evasiveness demonstrates that he wanted to go to jail, not that he did not understand that his conduct was wrong and would lead to his incarceration.

- 32 -

Again, Butler desired to go to jail, and the wrongfulness of his conduct is the very thing that drove him to act the way he did.

The bottom line is that Butler knew he was committing a crime; he did what he did because he wanted to go to prison, which is the consequence for committing a crime. While his conduct was motivated by his mental illness and was undisputedly not the product of rational thought, Butler was not legally insane at the time of the offense conduct because he still understood the nature, quality, and wrongfulness of his actions. Under the IDRA standard, even Kevin Butler, who acted as he did only because of an insane delusion that he was being persecuted by gang stalkers who wanted to kill him, is not legally insane. While the court's verdict in this case is that Butler is guilty, that verdict ultimately says more about the IDRA— and the lack of congruence between the insanity defense and a defendant's culpability—than it does about this case or about Butler's blameworthiness. The court has some sympathy for Butler and the reality, in his tortured mind, of his persecution that leads him to believe that he is only safe behind bars. But in enacting the IDRA, Congress created a standard that is exceedingly difficult to meet, as this case makes abundantly clear.

## IV.    VERDICT

In accordance with these findings of fact and conclusions of law, the court finds, beyond a reasonable doubt, that Defendant Kevin C. Butler is guilty of Counts 1 through 7 of the Indictment.

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Verdict to all counsel of record.

**ENTERED** this 24 day of March, 2025.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE