IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | |
| v.   ) | Case No. 7:22-CR-00046 |
| ) | |
| KEVIN C. BUTLER  ) | |
| ) | |
| *Defendant*    ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by counsel, hereby submits its sentencing memorandum in this case and respectfully requests, for the reasons set forth below, that the Court sentence the defendant, Kevin Butler, to 84 months imprisonment and three years of supervised release.

**FACTUAL AND PROCEDURAL BACKGROUND**

In early December 2022, Mr. Butler made a series of phone calls to the Virginia Probation and Parole Office in which he threatened the lives of then-President Joe Biden and then-Vice President Kamala Harris. Mem. Op., at 8–9 (ECF No. 148).

On December 15, 2022, a grand jury sitting in this District returned a 7-count indictment against the defendant, Kevin Butler, charging the defendant with knowingly and willfully making various threats against the president of the United States and successors to the presidency, in violation of 18 U.S.C. § 871. After a two-day bench trial on December 11 and 12, 2024, the Court found the defendant guilty on all counts. Verdict (ECF No. 149).

**GUIDELINES CALCULATION**

The undisputed Base Offense Level in this case is a level 12, and there is no dispute that Mr. Butler gets a 2-level enhancement for having made more than two threats. Presentence Investigation Report ("PSR") ¶¶ 27, 28 (ECF No. 164). Probation has correctly applied a 6-level

1

official victim enhancement, PSR ¶ 29, which the defendant disputes, Def.'s Objs. to PSR ("Def.'s Objs.), at 1–4 (ECF No. 163). Probation has also correctly declined to provide an adjustment for acceptance of responsibility, PSR ¶ 38, although the defendant disagrees with this decision as well, Def.'s Objs., at 4–7.

### A. Official Victim Enhancement

The official victim enhancement applies where, as relevant here, the victim was "a government officer or employee" and where "the offense of conviction was motivated by such status." U.S.S.G. § 3A1.2(a). With respect to this latter requirement, it need only be the case "that the offender *targeted* the victim because of the victim's official status." *United States v. Abbott*, 221 F. App'x 186, 189 (4th Cir. 2007).

There is no doubt in this case that the defendant targeted Joe Biden and Kamala Harris because of their official roles—that is, because they were, at the time, the President and Vice President, respectively. To put it differently, if Joe Biden had not been the President in December 2022 (and Kamala Harris not the Vice President), he (and she) would not have been the target of the defendant's threats—whomever else was in the role would have been. That squarely answers the question of whether the defendant was motivated by President Biden and Vice President Harris's official statuses.

This is apparent from the defendant's own words—his threats often generically referred to "the President" or "the Vice President" rather than to Joe Biden or Kamala Harris specifically, PSR ¶¶ 5–7, 9, 10, which makes it clear that he was specifically targeting the people who held those offices *because* they held those offices. The defendant struggles to dispute this. Indeed, in explaining that he was targeting people in the government because he purportedly believed that it was government leaders who control the gang stalkers, Def.'s Objs., at 3, he effectively concedes

2

the point. Regardless of his belief system, his admission that he targeted government officials qua government officials is enough to establish that he was motivated by Joe Biden and Kamala Harris's official statuses.

In a case with nearly identical facts, the Eleventh Circuit concluded the same. That defendant—like Mr. Butler—argued that his threats to kill "the President" (then George W. Bush) were not motivated by President Bush's official status but by his delusional belief that President Bush was, in his individual capacity, committing various crimes. *United States v. Russell*, 322 F. App'x 920, 925 (11th Cir. 2009). "The district court found that there was 'no doubt' that [the defendant] was motivated by the President's status," and the Eleventh Circuit found no error. *Id.* Even though the defendant's "stated motivation involved delusions of the abuse, rather than the proper use, of official power," the court found "no clear error in the trial court's determination that the inciting imagined actions were associated with the President's official status." *Id.* "[I]t was sufficient to find that [the defendant] was provoked by acts he believed the President was committing by virtue of the power and opportunity afforded to him, *qua* President." *Id.* The same analysis applies here.

Lastly, it is important to emphasize how striking the defendant's argument is. It adds an extra—and atextual—layer to the assessment of the "official motivation" requirement of § 3A1.2 that seemingly requires an assessment of not just whether the defendant was motivated by the fact that the victim was a public official, but also whether the defendant's views about the victim public official were consistent with that official's "actual role[]." *See* Def.'s Objs., at 4. At bottom, whether there should be a carve-out in § 3A1.2 for a defendant who is too deluded or ignorant to understand the actual duties of whatever public official such individual chooses to target is a policy

3

decision that must come from the Sentencing Commission (or Congress). The defendant's objection should be overruled.

### B. Acceptance of Responsibility

The defendant also argues that he should be entitled to a reduction for acceptance of responsibility. The defendant concedes that he would likely not be entitled to such a reduction if he denied any of "the essential factual elements of guilt." Def.'s Objs., at 4. And while he argues that he admitted to "the essential factual elements," he simultaneously acknowledges—as he must—that this is inaccurate. *See* Def.'s Objs., at 6 ("He did contest the second element, challenging whether the threats were 'true threats.' ").

The parties agreed at the outset of this case that the offense for which the defendant was on trial contained three factual elements, one of which was whether his words were a true threat. Def.'s Trial Br., at 2–3 (ECF No. 112); Gov't's Trial Br., at 1 (ECF No. 115). And at trial, and in his post-trial briefing, the defendant specifically argued: "[T]here is insufficient evidence that the statements were true threats, and therefore, the government did not meet its burden in establishing this element beyond a reasonable doubt." Def.'s Post-Trial Br., at 44 (ECF No. 146). The Court acknowledged this dispute and found that the Government had in fact met its burden on this element. Mem. Op., at 27–30.

The defendant now argues, without citation, that this argument was "more akin to a challenge to the applicability of a statute to his conduct." Def.'s Objs., at 6 (internal quotation marks omitted). But that is wrong. A defendant who "attack[s] the legal sufficiency of an essential element of his offense"—as the defendant did in disputing whether his threats were "true"—has "contested his guilt in fact." *United States v. Smoot*, 690 F.3d 215, 225 (4th Cir. 2012).

4

In addition, the fact that the defendant raised an insanity defense necessarily means that he was arguing that he "lacked the capacity to form the *mens rea* (and thus lacked the *mens rea* necessary for the imposition of criminal responsibility." *United States v. Gorsuch*, 404 F.3d 543, 546 (1st Cir. 2005). This, too, amounts to a dispute as to an essential factual element of guilt. *Id.*

The defendant contested two factual elements of the offense. His objection with regard to Probation's decision not to award acceptance of responsibility credit should thus be overruled.

### C. Final Calculation

As Probation has correctly calculated, the defendant's Total Offense Level is a level 22, and he is a Criminal History Category VI. PSR ¶¶ 39, 60. This results in a guideline range of 84–105 months.

## LEGAL STANDARD

In determining the appropriate sentence to be imposed upon the defendant, the Court must consider the factors set forth in 18 U.S.C. § 3553(a). These factors require the Court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant[.]" 18 U.S.C. § 3553(a)(1). The Court must also consider the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; "to afford adequate deterrence to criminal conduct"; "to protect the public from further crimes of the defendant"; and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Id.* §3553(a)(2). The other important § 3553(a) factors that the Court must consider are the kinds of sentences available, the Sentencing Guidelines range, any pertinent policy statement issued by the Sentencing Commission, "the need to avoid unwarranted sentence disparities among defendants

with similar records who have been found guilty of similar conduct," and the need to provide restitution to any victims. *Id.* § 3553(a)(3)–(7).

With respect to the Guidelines range, application of the Guidelines is no longer mandatory, *see United States v. Booker*, 543 U.S. 220, 245 (2005), although the Guidelines still play a "central role" in the sentencing decision, *Molina-Martinez v. United States*, 578 U.S. 189, 199 (2016). Indeed, in most instances, "the Guidelines are not only the starting point . . . but also the lodestar." *Id.* at 200.

## ARGUMENT

The Government considers the factors discussed below to be most pertinent to the Court's evaluation of an appropriate sentence in this case and to justify a sentence of 84 months imprisonment and three years of supervised release.[1]

### A. Nature and Circumstances of the Offense

This case involves the defendant's graphic and persistent threats against the lives of President Biden and Vice President Harris. In finding the defendant guilty of making the charged threats, the Court found that the defendant was "motivated by his beliefs about and fear of gang stalkers and his fear of being harmed by gang stalkers if he were to return to Virginia Beach." Mem. Op., at 25. And the Court found that, in doing so, the defendant not only knew that he was committing a crime, but that he acted as he did precisely because of that fact. Mem. Op., at 31.

It does not appear that the defendant harbored any particular malice towards President Biden or Vice President Harris, or that he had any genuine intent to harm them, which mitigates

---

[1] The defendant has been convicted of seven violations of 18 U.S.C. § 871, each of which has a statutory maximum of 60 months. To account for the threats to both victims and the greater number of threats to President Biden, it may make sense to sentence the defendant to a lengthier term of imprisonment on his threats to President Biden and to a shorter but consecutive prison term for his threats to Vice President Harris. The Government would recommend that Mr. Butler be sentenced to 48 months on Counts One through Five, to be served concurrently, and 36 months on Counts Six and Seven, to be served concurrently with each other but to be served consecutively with Counts One through Five.

6

the seriousness of his offense.[2] However, there are two aspects of this case that make it more serious than other presidential threats cases: the defendant's repeated and escalating threats and his history of making similar threats. Beginning with the first, the defendant left several chilling voicemails, each containing numerous menacing and graphic threats, conduct that only "escalated" when he did not achieve his desired result. *See* Mem. Op. at 25. And the ostensible seriousness of these threats required the Secret Service to send an agent out—on a Saturday—to go talk to Mr. Butler to assess the level of threat that Mr. Butler might pose. Trial Tr. vol. 1 146:21–147:24. Accordingly, regardless of the level of actual harm that Mr. Butler posed to the president and vice president, his threats were treated seriously and forced the Secret Service to launch an investigation into his sincerity.

As to the second, the defendant has been down this same road before. Not only is this not the defendant's first conviction for making threats, it is not even his first federal conviction for making threats against the president and vice president. In 2014, he pleaded guilty in the Eastern District of Virginia to threatening then-President Obama and then-Vice President Biden. Mem. Op., at 10. And thus, in 2022, he understood—indeed, intended—the precise gravity of his threatening conduct, knowing perfectly well that he would be contacted by the Secret Service and charged with a federal crime, just as he was approximately a decade ago.

### B. History and Characteristics of the Defendant

However, Mr. Butler's criminal history stretches well beyond making threats against the president and vice president. His past is littered with other threatening, violent, and/or antisocial behavior, as well as various drug offenses, starting from when he was just 17. Among many others, these additional criminal incidents include assaulting and robbing an 80-year-old man, stabbing a

---

[2] Having said that, a person's willingness to so cavalierly threaten another person's life to achieve one's own ends is itself shameful, immoral, and deserving of substantial punishment.

7

correctional officer, robbing and beating a man over a mere $6, and having sex with a thirteen-year-old girl (when he was thirty-two years old). PSR ¶¶ 44, 45, 48, 50

Mr. Butler's disrespect for the law is also evident from how he has behaved while in custody and while under judicial supervision. Not only has he violated prison rules and regulations during previous periods of confinement, but during one relatively short stint in the Virginia Department of Corrections, he was cited for nineteen violations, including threatening, violent, and other offensive behavior. PSR ¶ 48, 51. And he has repeatedly violated probation and supervised release and absconded from supervision. PSR ¶¶ 50, 51, 54.

It is apparent that one of the driving forces in Mr. Butler's life has been his mental health problems, a history with which the Court is by now intimately familiar. As the Court noted in its findings of fact, Mr. Butler has a diagnostic history of paranoid delusions and various mental health diagnoses, including antisocial personality disorder. Mem. Op. 4, 17, 24. He also has a long history of malingering and manipulative behavior, some of which the Court observed during the course of trial. Mem. Op. 4, 14 & n.12, 17 n.14, 25.

Most recently, Dr. Kristina Lloyd evaluated Mr. Butler earlier this year, subsequent to his convictions in this case. She observed some of the same malingering and manipulative behavior that Dr. Schumacher and the Court observed. *See* Lloyd Forensic Eval., at 8. And, like many before her, she diagnosed Mr. Butler with a personality disorder, one that she noted had paranoid and antisocial traits. *Id.* Such a disorder, Dr. Lloyd noted, stems from a person's "consistent patterns of choosing to interact with the world in a dysfunctional way because the individual consistently chooses to believe this is the best way." *Id.* "Treating" such a disorder requires a willingness to change, and medication is unlikely to be beneficial. *Id.* at 8–9.

8

Dr. Lloyd also noted Mr. Butler's paranoia, including a general belief that people want to harm him. *Id.* at 9. And like Dr. Schumacher, she concluded that he has personality traits consistent with antisocial personality disorder. *Id.*; Mem. Op., at 17. As Dr. Lloyd noted: "Individuals with antisocial personality disorder are frequently deceitful and manipulative in order to gain personal profit or pleasure. They may repeatedly lie, use an alias, con others, or malinger." Lloyd Forensic Eval., at 9. They may also be aggressive and violent. *Id.*

Dr. Lloyd also agreed with Dr. Schumacher that there was insufficient evidence to support a diagnosis of a psychotic disorder, concluding that Mr. Butler's "paranoia is not delusional but rather represents his worldview." *Id.* at 10.

While it is clear that all of this has motivated some of Mr. Butler's criminal activity, and has generally caused him to struggle to conform his conduct to the confines of the law, this behavior is not as significant of a mitigating factor as might otherwise be apparent. As Dr. Lloyd notes throughout her report, Mr. Butler has a personality disorder, not a mental illness. And this personality disorder is the result of his own choices in terms of how he has chosen to live his life. These decisions have no doubt impaired his ability to live a law-abiding life. But he alone is responsible for having made those choices. Indeed, Dr. Lloyd's report reflects that Mr. Butler's personality disorder has contributed to him being unusually aggressive and violent, which makes him more dangerous than many other individuals. As a result, not only is this not a mitigating factor, but it is an aggravating one.

**C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment for the Offense, and to Afford Adequate Deterrence to Criminal Conduct**

Threatening the life of a public official is an extremely serious offense, and it is important that the punishment for such an offense reflect that seriousness. We live in a time of fierce political divisions where there are a number of recent examples of tactless political rhetoric, threats against

9

public officials, and even attempted and completed acts of violence against such officials. It is all the more important, then, to mete out a substantial sentence in this case and others like it to demonstrate that our society will not tolerate this type of antisocial and dangerous behavior and to deter others from jeopardizing the safety of those who have dedicated themselves to public service.

In this case, beyond the need to deter others and to promote their respect for the law, it is also necessary to specifically deter Mr. Butler. Mr. Butler has repeatedly threatened—and perpetrated—violence against various individuals, including multiple public officials. His nineteen-month sentence that was imposed in 2014 (and which does not count the several additional months imposed for subsequent supervised release violations) was seemingly not hefty enough to deter Mr. Butler from again threatening the president and vice president.[3] Given Mr. Butler's recidivism, a much stiffer sentence than was previously imposed is necessary for purposes of specific deterrence.

**D. The Need for the Sentence Imposed to Avoid Unwarranted Sentencing Disparities**

While the JSIN data turned up too few defendants sentenced over the last five fiscal years under the same primary guideline with the same Final Offense Level and Criminal History Category to provide any information, there is JSIN data on similarly-situated defendants with slightly lower and slightly higher Final Offense Levels. Eight defendants had a Final Offense Level of 21 and received an average length of imprisonment of 74 months and a median length of imprisonment of 77 months (the low end of the Guidelines). Four defendants had a Final Offense Level of 24 and received an average length of imprisonment of 144 months (well above the Guidelines) and a median length of imprisonment of 120 months (near the high end).

---

[3] While the Government does not have access to Mr. Butler's prior PSR, it appears that his guideline range at the time was 41–51 months. *See* Def.'s Sentencing Position, at 1, 3:14-CR-13 (E.D. Va.) (ECF No. 31).

10

A sentence of 84 months in this case is in line with this data, including when taking into account the defendant's mental health history and personality disorder.

### E. The Need for the Sentence Imposed to Protect the Public

Lastly, the defendant has demonstrated that he poses a substantial threat to the public. In this case alone, he took it upon himself to engage in violent and dangerous behavior seemingly for his own peace of mind. Such selfish and antisocial behavior has no limits, and the defendant's history demonstrates that once he is released from custody, he will again engage in violent and dangerous behavior. A lengthy sentence is thus important for purposes of protecting the public.

## CONCLUSION

For the reasons stated above, the Government respectfully requests that the Court sentence Mr. Butler to a term of imprisonment of 84 months and a three-year term of supervised release.

Respectfully submitted,

ROBERT N. TRACCI
Acting United States Attorney

/s/Jason Mitchell Scheff
N.Y. Bar No. 5188701

/s/Keith Parrella
AZ Bar No. 019243

Assistant United States Attorneys
United States Attorney's Office
310 1st Street SW, Suite 906
Roanoke, VA 24011
(540) 857-2250
keith.parrella@usdoj.gov
Jason.Scheff@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2025, I caused to be filed electronically the above-captioned pleading with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

                                              s/Jason M. Scheff
                                              Assistant United States Attorney