IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Criminal No. 7:22CR0046-TTC |
| ) | Sentencing: November 21, 2025 |
| KEVIN C. BUTLER, ) | |
| ) | |
| Defendant. ) | |

### DEFENDANT'S SENTENCING MEMORANDUM

*I want my life back. I had a real life before the gang stalkers. I was engaged. I used to dress well. What can be done about the gang stalkers trying to kill me?—Kevin C. Butler*

This case ultimately involves the delicate balance between imposing a just sentence considering Mr. Butler's documented lifelong mental health history that is intricately intertwined with the offense conduct, while considering the protection of the public given that very history. Under all the circumstances of this case, including the nature and circumstances of the offense and Mr. Butler's history and characteristics, a sentence within the advisory guideline range would be unjust and greater than necessary to effectuate the purposes of sentencing under 18 U.S.C. § 3553(a).

At approximately 3:00 a.m. on November 18, 2022, Mr. Butler arrived at the Catawba Hospital, a state-run psychiatric facility. He was taken there by two officers of the Fairfax County Police Department after suffering a mental health episode days earlier at a Safeway grocery store in Fairfax, Virginia. During the trial, Fairfax County Police Department Officer Christian Vigil testified that she reported to the Safeway in response to an emergency call placed by Mr. Butler. When she arrived, he told her that people were trying to kill him. To the officer, Mr. Butler

1

appeared "a little paranoid, like very fidgety. He couldn't really kind of stand in one place because he claimed that people kept coming out and that they were trying to kill him." Trial Tr. 1:175:20-25.

By the time Mr. Butler arrived at Catawba, he had already been admitted to mental health hospitals in Pennsylvania, New Jersey, Tennessee, and Virginia dozens of times within the last prior 14 years, although his mental health history began when he was in elementary school. During this 14-year period, beginning in 2008, Mr. Butler has been tormented by a persistent delusion of people constantly following him and trying to kill him. A group of people he refers to as "gang stalkers," who are led by the President and Vice President.

His fear and loathing of the gang stalkers caused him to send a letter threatening then-President Barack Obama and his family from a state prison facility in 2012. PSR ¶ 51. In that case, when Mr. Butler was interviewed by a Secret Service special agent, he acknowledged sending the letter. When asked what he would do if the President was in room with him, Mr. Butler initially stated that he "would talk with him to get the people to stop following me."

Mr. Butler's persistent calls from Catawba to the Virginia Beach Probation and Parole office threatening then-President Joseph Biden, his family, and then-Vice President Kamala Harris, as well as repeating threats to Special Agent Jeffery Norman, were all a part of his desperate and misguided way of trying "to get the people to stop following" him. Thus, while he stands to be sentenced for making those threats, they were made because he suffered from pervasive delusions that have plagued him for many, many years.

**ARGUMENT**

*Thirty-six months imprisonment with supervised release is an appropriate sentence under the circumstances of this case.*

District court judges are given sound discretion in sentencing to ensure a just sentence is imposed which reflects an individualized assessment of all the circumstances of the case, and the defendant himself. While the Guidelines exist as a starting point of the court's analysis, effective sentencing requires this discretion so that the court may weigh the various sentencing factors as they pertain to the particular case and the particular defendant. This approach demonstrates that the complexity of criminal cases demands more than the rigid application of the Guidelines and requires the measured discernment of experienced judges who are closest to the facts of the case.

1. **Applicable Sentencing Law**

Following the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220 (2005), the Federal Sentencing Guidelines were deemed advisory rather than mandatory, and federal appeals courts were tasked with reviewing criminal sentences for reasonableness. The Court further clarified the sentencing process in *Rita v. United States*, 551 U.S. 338, 347-48 (2007), emphasizing that district courts must first correctly calculate the advisory guideline range before considering the factors set forth in 18 U.S.C. § 3553(a). The court must then evaluate whether the proposed sentence is consistent with those factors, without assuming the reasonableness of the Guidelines range. This principle was reinforced in *Gall v. United States*, 552 U.S. 38, 50 (2007), which reaffirmed that sentencing judges have discretion to impose a sentence outside the Guidelines range if supported by the relevant statutory factors.

A core principle of federal sentencing is that each defendant must be treated as an individual, with every case evaluated based on its unique circumstances. As expressed in *Koon v.*

*United States*, 518 U.S. 81, 113 (1996), this approach allows for the consideration of factors that may either lessen or increase the severity of the crime and the appropriate punishment. Similarly, in *Gall*, the Court rejected the idea that "extraordinary circumstances" must be present to impose a sentence outside the guideline range. 552 U.S. at 47. The Court found that imposing such a requirement would improperly restrict a judge's discretion to consider the full range of sentencing factors and would contradict the principle that appellate courts apply an abuse-of-discretion standard when reviewing sentencing decisions, rather than imposing stricter rules for deviations from the Guidelines. *Id*. at 49.

In line with this reasoning, the Supreme Court held in *Rosales-Mireles v. United States*, 585 U.S. 129, 150 (2018), that while the advisory guideline range is one of the factors courts must consider during sentencing, judges are not required to give it any specific weight. Indeed, district courts have the discretion to disagree with the Guidelines and, in appropriate cases, impose a sentence below the advisory range when the circumstances warrant it. *Kimbrough v. United States*, 552 U.S. 85, 109-110 (2007). While a within-Guidelines sentence is often presumed reasonable, courts are not bound to impose it if the factors under 18 U.S.C. § 3553(a) suggest otherwise. The Supreme Court has further confirmed in *Chavez-Meza v. United States*, 585 U.S. 109, 112 (2018), that district courts have the authority to impose a sentence outside the advisory range.

Recognizing this judicial discretion, variances play a crucial role in ensuring that sentences are properly tailored to the unique circumstances of each case. As Justice Stevens observed, the Sentencing Commission has not established specific standards or recommendations for considering many individual characteristics, including age, education, mental or emotional condition, medical condition (such as substance use disorders), employment history, family ties,

and other personal factors. *Rita*, 551 U.S. at 364-65 (Stevens, J., concurring). However, § 3553(a) explicitly authorizes sentencing judges to consider these factors when determining a fair and just sentence.

In determining an appropriate sentence, the court must consider not only the Guidelines but also the statutory factors outlined in 18 U.S.C. § 3553(a), including: the nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1)); the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and offer appropriate correctional treatment (§ 3553(a)(2)); the kinds of sentences available (§ 3553(a)(3)); the need to avoid unwarranted disparity among defendants with similar records and conduct (§ 3553(a)(6)); and the need to provide restitution to victims (§ 3553(a)(7)). Ultimately, § 3553(a) mandates that the court impose a sentence that is "sufficient, but not greater than necessary" to fulfill the objectives of federal sentencing.

    2.  **Additional Section 3553(a) Factors**

      a.  *Nature and Circumstances of the Offense*

The combined advisory guideline range in this case is 84-105 months' imprisonment. However, this range is just one of several factors that this court must consider in determining the appropriate sentence in this case.

This court found Mr. Butler guilty of all seven charged counts of Threats Against the President of the United States and Successors to the Presidency, in violation of 18 U.S.C. § 871. The maximum penalty for each count is five years of imprisonment.

The Offense Conduct section in the PSR gives a fair account of the facts in this case. In addition, this court is intimately familiar with the facts of this case given the bench trial and the Memorandum Opinion finding Mr. Butler guilty. Therefore, while a detailed recitation of the facts will not be included here, some facts are worth highlighting.

Mr. Butler made a series of phone calls from a mental health institution where he was admitted for nearly three weeks from November 18 through his discharge upon his arrest on December 7, 2022. He clearly identified himself in all but one call. Mr. Butler began making these calls when it became apparent to him that he would be required to report to Virginia Beach Probation and Parole and eventually required to reside in a homeless shelter in Newport News where he did not feel safe from the gang stalkers. Mr. Butler made two calls on December 1, 2022; one call on December 2, 2022; and three calls on December 7, 2022. In addition, he repeated threats to Special Agent Norman on December 3, 2022.

Prior to these calls, Mr. Butler called his probation officer multiple times from about July 15 through July 26, 2022, while at various hospitals and made odd statements to her. Those statements included that he had been followed since 2008; "Sex Money Murder" people were following him; people were going to kill him; his request that he be relocated out of the country; suggestions that his food had been poisoned; his request that five detectives accompany him to the probation office with recording devices; his desire for a new identity so he could leave the country; being followed to the hospital by people wearing civilian clothes; writing a letter to the President to ask him to stop having people follow him; when he spotted people following him, they beep their horns, which causes him to hop from cab to cab; the probation officer was going to get him

killed; an injection gave him microchips in his forehead, hands, knees, and toes; and he was hospitalized so that he could regroup from the gang stalkers.

During his interview with Special Agent Norman, Mr. Butler stated gang stalkers were following him and could assume the role of a doctor, nurse, or police officer, and they were trying to kill him. The agent deduced Mr. Butler's statements were paranoid beliefs.

After three weeks of observing Mr. Butler, Ry Bergum concluded Mr. Butler was malingering. However, many of Mr. Bergum's colleagues observed abnormal behavior. Those observations included exhibiting psychiatric instability, abnormal and persecutory delusions, paranoid delusions about people trying to get him, and a fixed delusion that the officers and others are trying to kill him.

Mr. Butler testified gang stalkers are people who work for the government, and they are part of an operation run by the various government agencies directed by the President. His statements and behavior demonstrate he was suffering from this delusion when he made the threatening calls and statements.

### b. *History and Characteristics of Kevin Butler*

Mr. Butler believed he had a life before the gang stalkers infiltrated it. Perhaps it was not the best, most stable life, but to him, it was better than the torment he is experiencing now. He is 47 years old, and unfortunately, his mental health struggles have been an ongoing theme in his life. He grew up in Philadelphia, Pennsylvania with his mother and father who were married until they separated when he was about 15 years old. PSR ¶ 94. He reported both of his parents worked to provide for the family, and his basic needs were met. *Id.* He also reported he lived in a low-income neighborhood and was exposed to crime in the streets. *Id.* Mr. Butler stated he did not really feel

like he had a happy childhood. PSR ¶ 90. While he was close to his father who always supported him, he felt as if his mother frequently yelled at him and treated his siblings differently. He felt as though he was "targeted." *Id.*

Despite his mental condition, Mr. Butler tried to make the best of his circumstances. His mother recalled when Mr. Butler was younger, he would play in the neighborhood with other kids. She also stated when he was about 12 or 13 years old, he would help older neighbors with tasks such as carrying grocery bags in their homes. His cousin, Luther Perry also remembers Mr. Butler helping seniors with shoveling snow and taking out their trash. During a defense interview, Mr. Perry stated that Mr. Butler is family-oriented, and he was significantly affected by the death of his father. Mr. Perry acknowledged that his cousin has struggled with mental health issues, but outside of those issues, he is a good person who loved to dress well, loved music, and loved to dance. Mr. Perry stated that Mr. Butler is a people person and can have a conversation with anyone. When Mr. Perry was younger, Mr. Butler counseled him about staying out of trouble and not making the same choices he made. Finally, Mr. Perry stated that Mr. Butler was handy in that he paints and works on cars.

In a defense interview, his mother reported Mr. Butler began experiencing mental health issues around five years old, when he was in kindergarten. His problems initially emerged as temper tantrums. He began seeing a counselor and continued to do so throughout elementary school. She acknowledged he was not always compliant with his medication and often violated the rules of the house. PSR ¶ 94. From Mr. Butler's perspective, it felt as if his parents "cooked up stories" and kept putting him in mental hospitals for several months between the ages of 10-12. Shortly after this time period, he was sexually assaulted by an adult female who was never

prosecuted. It is unclear whether he received any counseling as a result of this incident, and it undoubtedly had some impact on his already fragile mental condition. He noted he had issues in school, eventually leaving after completing the eighth grade. His mother reports he began having difficulties with the schoolwork.

After his parents' separation, he lived briefly with his father before returning to live with his mother. Eventually he began to reside with his grandmother at the age of 16 because his mother "couldn't deal with him." Shortly after, he incurred his first and only juvenile adjudication for simple assault. His mother reports that once Mr. Butler left high school, he left the home, and he was "on his own."

On his own, with untreated mental health conditions and an eighth grade education with no life or job skills, resulted in a series of convictions from age 19 to 30 that involved theft, assaultive conduct, and drug distribution. These convictions, and a later conviction for carnal knowledge, occurred about 15-24 years prior to the offense conduct in this case.

The full extent of Mr. Butler's mental health issues did not come to light until his charge and eventual conviction in 2014 for the same charge he faces now. At that time, his defense counsel obtained voluminous records from various mental health hospitals beginning in 2007, many of which this court has reviewed in this case. Those records show various diagnoses including bipolar disorder, personality disorder, cocaine dependency, malingering, antisocial personality disorder, depression, borderline personality disorder, impulse control disorder, psychosis, paranoia, and psychotic disorder. PSR, 2014, pp. 22-27, attached to ECF No. 164. While the records reflect that it is unclear whether his paranoia was due to drug intoxication or mental illness, there is a

consistent theme that people, including the police and U.S. Marshals, are out to get him or to kill him. *Id.* at p. 25.

In the prior federal case, he was determined to be incompetent by Dr. Evan Nelson, then restored to competency after a provider with the Bureau of Prisons ("BOP") diagnosed him with antisocial personality disorder with borderline personality traits, rule out other specified schizophrenia spectrum and other psychotic disorder, severe cocaine use disorder in a controlled environment, mild cannabis use disorder in a controlled environment, and rule out other/unknown substance disorder, severity unspecified. *Id.* at p. 29.

Dr. Jonathan DeRight, a neuropsychologist and clinical psychologist retained by the defense in this case, reviewed records in this case and testified about his observations. Trial Tr. 1:200-202. Those records include a 2009 record from Albert Einstein Hospital, where he talked about the people following him and said, "don't kill me like this." At Ancora Hospital, he reported that people were after him while he was riding a train. During a 2012 evaluation, Mr. Butler reported that there was a conspiracy against him, his attorney may be involved, and he was worried he was going to be killed. During a hospitalization for competency restoration in 2012-2013 at Central State Hospital, Mr. Butler was diagnosed with paranoid schizophrenia, malingering, psychotic disorder not otherwise specified, and antisocial personality disorder. He expressed similar delusions about a conspiracy against him and people poisoning his food. At Friends Hospital, Mr. Butler reported that he was afraid for his life, and the providers observed that he had paranoid delusions, loose associations, and worsening psychotic symptoms. In 2020, at Temple University Hospital, Mr. Butler made statements that someone was after him, including the FBI, and he felt the need to protect himself. Dr. DeRight testified that Mr. Butler made similar

statements in 2021 and 2022 while he was hospitalized at Eastern State Hospital and Northern Virginia Mental Institute.

Dr. DeRight diagnosed Mr. Butler with schizophrenia spectrum disorder and factitious disorder. BOP providers Drs. Lauren Schumacher and Kristina Lloyd reached similar conclusions about Mr. Butler's mental condition. Dr. Schumacher diagnosed him with malingering, antisocial personality disorder, specified personality disorder with borderline features, cannabis use disorder, cocaine use disorder, and unspecified schizophrenia spectrum or other psychotic disorder. PSR ¶ 102. Dr. Lloyd diagnosed him with other specified personality disorder with paranoid and antisocial traits, stimulant use disorder (cocaine), mild, in sustained remission. PSR ¶ 106.

This court ultimately determined that "Butler had genuine delusional beliefs about gang stalkers and that the gang stalkers are real to Butler," and "at the time of the offense conduct, Butler suffered from delusions about gang stalkers, who he believed were trying to kill him." ECF No. 148, at 23. In addition, this court found that Mr. Butler "suffered from genuine delusions independent of his cocaine use." *Id.* at 24. This court further noted that it "is convinced that Butler's mental illness is at the root of the thought process that led him to make threats against the president; those actions were not the product of rational decision making." *Id.* at 25. Finally, this court found that Mr. Butler suffered from a severe disease or defect at the time of the offense and that severe disease or defect caused him to commit the offense. *Id.* at 31.

Therefore, while this court determined that Mr. Butler did not prove by clear and convincing evidence that he was legally insane, the court can nevertheless determine by a preponderance of the evidence that his severe disease or defect played a significant role in the commission of the offense. While no longer a formal departure, the Commission has

acknowledged that diminished capacity is a basis to impose a sentence outside of the advisory guideline range.[1] Under that provision, a sentence below the applicable guideline range may be appropriate if "(1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense . . . . the extent of the [variance] should reflect the extent to which the reduced mental capacity contributed to the commission of the offense." U.S.S.G. App B, at 204 (May 1, 2025) (former U.S.S.G. § 5K2.13). The court's findings discussed above support the application of this provision in imposing a variance sentence below the applicable guideline range.

### c. *Retribution, Incapacitation, Deterrence, and Rehabilitation*

The sentencing factors under 18 U.S.C. § 3553(a)(2) require the Court to consider retribution, deterrence, incapacitation, and rehabilitation when determining a just sentence. *See Tapia v. United States*, 564 U.S. 319, 325 (2011). The Court must impose a sentence sufficient, but not greater than necessary, to address these factors, ensuring it reflects the specific circumstances of the case and the defendant's individual characteristics. *See* 18 U.S.C. §§ 3551(a), 3553(a); *Tapia*, 564 U.S. at 325. Significant to this particular case, the sentence must be just by

---

[1] The November 1, 2025 Guidelines Manual removed all departure language in the Manual and put that language in Appendix B. Nonetheless, "the removal of departures from the Guidelines Manual does not reflect a determination by the Commission that the rationale underlying the deleted departure provisions is no longer informative or that a court should no longer consider such facts for purposes of determining the appropriate sentence. The removal of departures does not limit the information courts may consider in imposing a sentence and it is the Commission's intent that judges who would have relied upon facts previously identified as a basis for a departure will continue to have the authority to rely upon such facts to impose a sentence outside of the applicable guideline range as a variance under 18 U.S.C. § 3553(a)." U.S.S.G. App B, at 133 (May 1, 2025).

considering the facts of this case and balancing them against Mr. Butler's history and characteristics—both mitigating and aggravating.

Undoubtedly, this is a serious offense. Mr. Butler's repeated threats to then-President Biden and his family, as well as then-Vice President Kamala Harris, and the nature of those threats merit some measure of punishment because this court found that Mr. Butler understood that what he did was wrong. However, Mr. Butler had no real intent or ability to carry out these threats as he made them from a psychiatric hospital, and he was unstable and of meager means at that time. In addition, the threats to the President and Vice President were part of his delusion, as he believed they were in charge of the gang stalkers.

The recommended sentence of 36 months' imprisonment meets the goal of retribution by acknowledging the seriousness of the offense while appropriately balancing the mitigating facts discussed above. It is nearly twice the term of imprisonment that he received for his prior threats conviction. In this sense, 36 months is certainly punitive and sufficient to incapacitate Mr. Butler. In addition, this is a sufficient term to protect the public as it will keep him out of the community for 3 years.

An important component of the sentence is supervised release. "[S]upervised release represents a bridge or transitional period from the restrictions of full-scale incarceration to the complete absence of restrictions that comes from outright release." *United States v. Hamilton*, 986 F.3d 413, 418 (4th Cir. 2021). Indeed, supervised release was created to "to encourage rehabilitation after the completion of [the] prison term." *United States v. Haymond*, 588 U.S. 634, 652 (2019). "'[T]he primary purpose of supervised release is to facilitate the reentry of offenders into their communities, rather than to inflict punishment,'" *United States v. Ka*, 982 F.3d 219, 227

(4th Cir. 2020) (Gregory, J., dissenting) (citing *United States v. Murray*, 692 F.3d 273, 280 (3d Cir. 2012)). "'The congressional policy in providing for a term of supervised release after incarceration is to improve the odds of a successful transition from the prison to liberty.'" *United States v. Neuhauser*, 745 F.3d 125, 129 (4th Cir. 2014) (citing *United States v. Buchanan*, 638 F.3d 448, 451 (4th Cir. 2011) ("Supervised release . . . is a unique method of post-confinement supervision that fulfills rehabilitative ends distinct from those served by incarceration.")).

Court supervision is the most effective way to monitor Mr. Butler's compliance with mental health treatment. For the same reason, it is also another effective way of protecting the public. This court can impose up to three years of supervised release. While this court has the authority to impose consecutive terms of supervised release, Mr. Butler respectfully requests that this court impose concurrent terms.

Supervised release will also promote deterrence. Under federal supervision, Mr. Butler will be required to adhere to strict conditions and receive ongoing monitoring by a U.S. Probation Officer, ensuring accountability as he adjusts to living within the community. As pointed out in *United States v. Knights*, 534 U.S. 112, 119 (2001), supervised release itself is punitive, imposing significant restrictions on an individual's liberty. If he violates any conditions of his supervision, this court has many tools to address the violation including modifying the conditions or revocation and additional time in prison. Mr. Butler will need the structure and accountability of court supervision given his mental health condition. Thus, in determining the appropriate sentence for Mr. Butler, the court should consider all available sentencing options to ensure a fair and just outcome.

## **CONCLUSION**

Mr. Butler has not had an easy life. Certainly, some of his difficult circumstances were the result of decisions he made. However, for the last 17 years, he has been tormented by delusions that have permeated every aspect of his life. He used to have a life, but his life has become a mission to escape these delusions, the gang stalkers. These delusions motivated Mr. Butler to make these threats, although he had no real intent nor ability to bring any harm to the President or Vice President. While some measure of incarceration is appropriate given the facts of the case and Mr. Butler's criminal history, he needs help, and that help cannot be accomplished long-term by a lengthy term of imprisonment. *See* 18 U.S.C. § 3582(a) ("[I]mprisonment is not an appropriate means of promoting correction and rehabilitation.").

For the reasons discussed herein, Mr. Butler respectfully requests that this court impose a sentence of 36 months' imprisonment as to each count to be served concurrently, as well as a 3-year term of supervised release with a special condition that he participate in mental health and substance abuse treatment.

Should this court believe that additional incarceration is necessary, he respectfully requests that this court recommend placement at Federal Medical Center ("FMC") Lexington, so that he may have better access to mental health treatment. In addition, he requests that this court consider allowing him to be supervised in Philadelphia, where he has family, including his cousin, Mr. Perry, who will either provide or help Mr. Butler find housing.

//

//

//

                                      Respectfully submitted,
                                      KEVIN C. BUTLER

                                      By:      /s/
                                                     Counsel

Nia Ayanna Vidal, Esq.
Va. Bar # 48871
Counsel for Mr. Butler
Supervisory Assistant Federal Public Defender
Office of the Federal Public Defender
210 First Street, SW, Suite 400
Roanoke, VA 24018
(540) 777-0898
(540) 777-0890 (fax)
Nia_Vidal@fd.org